PHILLIP A. TALBERT
United States Attorney
SAM STEFANKI
ROSS PEARSON
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:20-CR-00213-KJM |
| Plaintiff, | OPPOSITION TO DEFENDANT'S MOTION TO CORRECT PRESENTENCE INVESTIGATION REPORT |
| v. | |
| CHALONER SAINTILLUS, | DATE: August 28, 2023 |
| Defendant. | TIME: 9:00 a.m. |
| | COURT: Hon. Kimberly J. Mueller |

The Court should overrule each of defendant Chaloner Saintillus's objections to the presentence investigation report (the "PSR") filed in this case.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On April 6, 2023, Saintillus pleaded guilty to a twelve-count superseding indictment charging him with distributing controlled substances such as fentanyl, heroin, and oxycodone.  Mins., ECF No. 214.  Saintillus attempted to enter a plea of *nolo contendere* before the Court made clear that it would not accept such a plea.  Mins., ECF No. 214.  No plea agreement between Saintillus and the government exists.

The Court set sentencing for August 28, 2023.  The United States Probation Office issued a PSR in which it calculated that Saintillus's sentencing range is between 135 and 168 months.  Sentencing Recommendation 1, ECF No. 227-1.  This sentencing range is based on a total offense level of 30 and a criminal history category of IV.  PSR ¶¶ 30, 55, ECF No. 227.

## II.   UNITED STATES' RESPONSE TO DEFENDANT'S PSR OBJECTIONS

The United States of America (the "government") respectfully requests that the Court overrule each of Saintillus's objections to his PSR.  *See* Formal Objs. and Mot. to Correct PSR, ECF No. 228 [hereinafter Def.'s Objs.].

### A.   Saintillus Does Not Merit an Adjustment for Acceptance of Responsibility.

The PSR declines to award Saintillus a 2-level downward adjustment in his offense level for acceptance of responsibility.  PSR ¶ 29.  Saintillus objects to the absence of this downward adjustment because he pleaded guilty before trial and stated in his PSR interview "that he has accepted full responsibility."  Def.'s Objs. 1.  The Court should overrule Saintillus's objection because despite pleading guilty, his own conduct makes clear that he has not accepted responsibility for distributing controlled substances in violation of federal law.

### 1.   An Adjustment Under Section 3E1.1 of the Guidelines Is Not Automatic.

A defendant who "clearly demonstrates acceptance of responsibility for his offense" should receive a two-level reduction in his offense level.  U.S. Sent'g Guidelines Manual § 3E1.1 (U.S. Sent'g Comm'n 2022) [hereinafter U.S.S.G.].  "The defendant bears the burden of demonstrating acceptance of responsibility, and must show 'genuine contrition for his acts.'"  *United States v. Rodriguez*, 851 F.3d 931, 949 (9th Cir. 2017) (citing *United States v. Osinger*, 753 F.3d 939, 948 (9th Cir. 2014)) (quoting *United States v. Dhingra*, 371 F.3d 557, 568 (9th Cir. 2004)).  Hence, a defendant who "enters a guilty plea is not entitled to an adjustment under this section as a matter of right."  U.S.S.G. § 3E1.1, cmt. n.3.

A sentencing court may consider a range of factors bearing on acceptance of responsibility, including whether the defendant voluntarily withdrew from criminal activity, whether he assisted authorities in recovering fruits and instrumentalities of his offense, the extent of his post-offense rehabilitation, and the timeliness of his manifestation of acceptance.  U.S.S.G. § 3E1.1, cmt. n.1.  A sentencing court may also consider whether the defendant's post-arrest statements demonstrate acceptance of responsibility.  *See United States v. Innie*, 7 F.3d 840, 848 (9th Cir. 1993) (upholding district court's denial of adjustment for acceptance of responsibility where defendant "refused to discuss the case with the probation officer and did not make a statement evidencing remorse at the sentencing hearing").  "The sentencing judge is given significant latitude under the Guidelines to assess the

sincerity of a defendant's claim of responsibility." *United States v. Mara*, 523 F.3d 1036, 1038 (9th Cir. 2008).

### 2. Saintillus Does Not Accept Responsibility.

Saintillus's conduct throughout this case demonstrates that he does not accept responsibility for his conduct within the meaning of section 3E1.1 of the Guidelines.

Saintillus only consented to entering actual guilty pleas when the Court refused to accept his preferred *nolo contendere* pleas. *See* Ex. 3 at 5 (containing transcript of change-of-plea hearing in which Saintillus said, "Mr. Fischer was advising me to plead guilty, but in my heart I feel that it's not what I really wanted to do. I wanted to plead no contest."). This shows that Saintillus does not accept responsibility because his preferred *nolo contendere* plea "is, first and foremost, not an admission of factual guilt." *United States v. Nguyen*, 465 F.3d 1128, 1130 (9th Cir. 2006). For this reason, Saintillus's own statement to the probation officer that "'I stand on the fact I plead No-Contest'" indicates that he does not believe he is actually guilty, even though he entered twelve guilty pleas after being advised of his constitutional rights consistent with Rule 11 of the Federal Rules of Criminal Procedure. PSR ¶ 17; *see generally* Ex. 3. The Court should deny Saintillus credit for accepting responsibility on this ground alone because "a refusal to admit one's guilt of the elements of an offense permits a district court to exercise its discretion to deny an acceptance of responsibility adjustment." *United States v. Mohrbacher*, 182 F.3d 1041, 1052 (9th Cir. 1999).

Saintillus's other behavior also provides a basis for overruling his objection and denying him acceptance credit. As the Court is well aware, Saintillus engaged in obstreperous and disruptive behavior throughout pretrial proceedings. Order 9–10, ECF No. 122 (describing Saintillus's "consistently disruptive" behavior and "disrespect for court proceedings"). At times, Saintillus interrupted the Court to such an extent that he was removed from the courtroom. *See* Mins., ECF No. 210 ("Due to the Defendant's interruptions, he was removed from the courtroom."). Such behavior provides a sufficient basis for the Court to determine that despite his guilty pleas, Saintillus has not truly accepted responsibility for his drug distribution. *See United States v. Hooker*, 456 F. App'x 549, 556 (6th Cir. 2012) (upholding district court's denial of acceptance adjustment due in part to defendant's "obstreperous and inappropriate conduct during pretrial proceedings").

Additionally, Saintillus persists in frivolously asserting that he is not actually Chaloner Saintillus, but instead a Moorish American citizen who is beyond the Court's power. *See* PSR ¶ 17 (containing Saintillus's statement to probation officer that, "'These crimes are Commercial Crimes, I do not consent to contract to a fictitious foreign state court.'"); Notice 3, ECF No. 71 ("I refute any presumptions to being a Mr. Saintillus . . . ."). This shows that Saintillus does not accept responsibility for his offense because it is a rehash of the same nonsensical Moorish claims he has repeatedly—and unsuccessfully—asserted as grounds for dismissal of his criminal case. Mot. for Dismissal 1, ECF No. 74 ("I am Shalam-Saintillus-Bey: In propria persona, sui juris hereby challenging the court's jurisdiction and status/full faith and credit."); Order 5, ECF No. 122 ("His arguments for dismissal are largely nonsensical. He is neither sovereign nor immune from federal criminal liability."). Raising such "transparently frivolous claim[s] that he [is] immune from prosecution under the laws under which he was charged," even after the Court squarely rejected that contention, provides the Court with a sufficient reason to overrule Saintillus's objection and deny him acceptance credit. *United States v. Jagim*, 978 F.2d 1032, 1038 (8th Cir. 1992).

### 3. Saintillus Provides No Evidence He Is Genuinely Contrite.

Finally, Saintillus fails to meet his burden to establish that he accepts responsibility because he provides no evidence connected to any of the other Guidelines factors that bear on acceptance credit.

Saintillus proffers no evidence that he did anything to aid authorities in recovering the fruits and instrumentalities of his offense. *See* U.S.S.G. § 3E1.1, cmt. n.1(E) (noting that aiding authorities in recovering fruits and instrumentalities of offense can help demonstrate acceptance). To the contrary, he wants more money, since he sued the federal government for $10 million in damages in a separate and frivolous civil action after the government charged him with drug crimes. *See Saintillus v. U.S. Sup. Ct.*, No. 2:23-CV-0776-AC-P, 2023 WL 3254963, at *2 (E.D. Cal. May 4, 2023), *report and recommendation adopted*, 2023 WL 4471585 (E.D. Cal. July 11, 2023).

Saintillus also provides no evidence that he rehabilitated himself while in custody following his arrest. *See* U.S.S.G. § 3E1.1, cmt. n.1(G) (noting that post-arrest rehabilitation can support acceptance credit). Instead, he simply asks the Court to "go easy" on him. PSR 30. Nor does the timing of his guilty pleas help his cause. *See* U.S.S.G. § 3E1.1, cmt. n.1(H) (noting relevance of timeliness of

manifestation of acceptance).  Saintillus pleaded guilty only a few days before trial, and continues to

maintain that he did so only "under duress and rule of necessitie [sic]."  PSR 29.

Clearly, Saintillus's only claim to the two-point adjustment he seeks is that he pleaded guilty.

Def.'s Objs. 1 ("Pleading guilty and stating that he has accepted full responsibility is enough for a 2-

level reduction for acceptance of responsibility.").  His position is at odds with the plain language of the

Guidelines, particularly where so much other evidence demonstrates that he does not truly accept

responsibility for dealing drugs on the dark web.  U.S.S.G. § 3E1.1, cmt. n.3 ("A defendant who enters a

guilty plea is not entitled to an adjustment under this section as a matter of right.").  Accordingly,

Saintillus fails to meet his burden to establish that he is entitled to a reduction in his offense level for

accepting responsibility, and the Court should overrule his objection and adopt the PSR's guidelines

calculation.

**B.**     <u>**The PSR's Base Offense Level Calculation Is Accurate.**</u>

The PSR calculates Saintillus's base offense level as 26 because he sold more than 400

kilograms of converted drug weight on the dark web.  PSR ¶ 21.  Saintillus objects to the PSR's base

offense level calculation because it includes sales that Saintillus made over the dark web to buyers other

than the undercover agents who conducted twelve controlled purchases from Saintillus over the course

of six months.  Def.'s Objs. 2.  The Court should overrule this objection because there is sufficient

evidence supporting the PSR's more than reasonable estimate of the drugs that Saintillus sold on the

dark web.  The government requests an evidentiary hearing to put this evidence on the record via

witness testimony and documentary exhibits.

1.     <u>A Sentencing Court Must Approximate the Drug Weight Involved in a
Defendant's Offense.</u>

Where "the amount [of narcotics] seized does not reflect the scale of the offense," the Guidelines

require district courts to approximate drug quantity.  U.S.S.G. § 2D1.1, cmt. n.5 (noting that the court

"shall" approximate drug quantity).

"Approximations of drug quantity must meet three criteria."  *United States v. Culps*, 300 F.3d

1069, 1076 (9th Cir. 2002).  First, the government must prove the drug quantity by a preponderance of

the evidence.  *United States v. Perez*, 962 F.3d 420, 448 (9th Cir. 2020), *cert. denied sub nom. Iraheta v.*

*United States*, 1441 S. Ct. 1443 (2021).[1]  Second, this supporting evidence must have "sufficient indicia of reliability," but need not be admissible at trial pursuant to the Federal Rules of Evidence.  *See* U.S.S.G. § 6A1.3(a); *see also Culps*, 300 F.3d at 1076.  Third, the court must "err on the side of caution" in approximating the drug quantity.  *Culps*, 300 F.3d at 1076 (quoting *United States v. August*, 86 F.3d 151, 154 (9th Cir. 2002)).  But while a district court must exercise caution in its drug calculation, it is reversible error for a district court to disregard a reliable approximation of drug quantity proven by a preponderance of the evidence.  *See United States v. Boone*, 279 F.3d 163, 184 (3d Cir. 2002).

There is no one-size-fits-all method of approximating drug quantity, so the Guidelines provide three examples of ways a court may do so.  A district court may consider "similar transactions in controlled substances by the defendant," "the price generally obtained for the controlled substance, [and] financial or other records."  U.S.S.G. § 2D1.1, cmt. n.5.  And the Ninth Circuit has also approved several methods of approximation, such as multiplying an estimated daily or weekly quantity by an applicable period of time, *Culps*, 300 F.3d at 1077, approximating based on volume of empty containers of narcotics, *United States v. Basinger*, 60 F.3d 1400, 1409–10 (9th Cir. 1995), and converting cash proceeds into equivalent drug quantity where there is evidence connecting the cash to drug sales, *see United States v. Gonzalez-Sanchez*, 953 F.2d 1184, 1187 (9th Cir. 1992) (per curiam).

2.    Courts Use a Variety of Evidence to Approximate Drug Weight in Dark Web Cases.

In cases involving the sale of drugs on the dark web, courts also use user reviews and statistics of sales to approximate drug quantity.

In a recent case in the Eastern District of Virginia, for instance, a defendant pleaded guilty to drug charges after he sold fentanyl-laced pills to an undercover officer on the dark web.  Plea Agreement, *United States v. McKernan*, No. 1:22-cr-00234 (E.D. Va. Dec. 9, 2022), ECF No. 29.  In its

---

[1] The government notes one unpublished case in which the Ninth Circuit suggested that the clear and convincing standard might apply to drug quantity calculations at sentencing.  *United States v. Maciel*, 785 F. App'x 458, 459 (9th Cir. 2019).  In *Maciel*, the court "assumed without deciding" that the clear and convincing standard applied because the "district court's drug quantity determination satisfie[d] the clear and convincing standard of proof."  The government does not believe *Maciel* controls here in light of *Perez*, but notes *Maciel* for the Court's awareness nonetheless.

guideline calculation, the presentence report in that case included not only the 450 pills that the defendant sold to the undercover officer, but also nearly 4,000 pills that the defendant sold on the dark web, a number approximated by using reviews from other customers who bought pills from the defendant on his dark web profile.  *See Def.'s Mem. in Aid of Sentencing at 4–9, United States v. McKernan*, No. 1:22-cr-00234 (E.D. Va. Apr. 3, 2023), ECF No. 35.  As the government explained in its sentencing memorandum in *McKernan*, customers left reviews when finalizing their purchases that included various information about the customer's purchase, including the date, product purchased, and amount paid.  U.S. Resp. to Def.'s Mem. in Aid of Sentencing at 2–3, *United States v. McKernan*, No. 1:22-cr-00234 (E.D. Va. Apr. 5, 2023), ECF No. 36.  The defendant objected to the use of such user reviews to calculate drug quantity.  Def.'s Mem. in Aid of Sentencing at 4–9, *United States v. McKernan*, No. 1:22-cr-00234 (E.D. Va. Apr. 3, 2023), ECF No. 35.  But the record shows that the district court overruled the defendant's objection.  Mins., *United States v. McKernan*, No. 1:22-cr-00234 (E.D. Va. Apr. 7, 2023), ECF No. 39.

Likewise, in another dark web case, the Third Circuit approved a district court's decision to approximate drug weight using various factors present in dark web cases.  These factors included virtual payments for the drugs, online price listings, the defendant's written communications with his distributors and customers, and agents' surveillance of the defendant retrieving packages containing narcotics in pill form.  *United States v. Gordon*, No. 20-1596, 2021 WL 3781722, at *1–2 (3d Cir. Aug. 26, 2021).

As discussed in further detail below—and as the government will prove at an evidentiary hearing—many of the factors that the courts relied upon to approximate drug weight in *McKernan* and *Gordon* are present in Saintillus's case as well.  Saintillus sold drugs on the dark web; his customers provided overwhelmingly positive reviews; he made thousands of dollars in cryptocurrency from his dark web activities; agents saw him ship pills to customers; and when agents ordered drugs from Saintillus, he reliably filled their orders.  Furthermore, the PSR's calculation is a conservative approximation of the quantity of drugs Saintillus sold using statistics from his dark web sales that are based on reliable and corroborated evidence.  The PSR's estimate therefore meets each of the three prongs set forth by the Ninth Circuit.  *See Culps*, 300 F.3d at 1076.

### 3.   Saintillus's Dark Web Profiles Reflected His Hundreds of Drug Sales.

The PSR's drug weight calculation relies on a conservative estimate of Saintillus's sales activity while he was active on the dark web, and which was prepared by government agents who will testify at the government's requested evidentiary hearing.

United States Postal Inspector Jason Bauwens prepared an estimate of Saintillus's historical drug sales based on data derived directly from Saintillus's dark web profile pages.  Ex. 4 (containing Inspector Bauwens's estimate of Saintillus's dark web drug sales, as submitted to assigned probation officer who prepared PSR).  Inspector Bauwens will testify at the evidentiary hearing about the methodology and data that he used to prepare his estimate of Saintillus's drug sales.  Specifically, Inspector Bauwens will testify that he visited Saintillus's dark web vendor profile page on the Empire marketplace numerous times, including approximately three weeks prior to when Empire ceased operations in August 2020.  Inspector Bauwens will detail how Saintillus's vendor page listed the number of sales made since 2019 for each drug listing available for purchase from Saintillus.[2]  Inspector Bauwens will explain how he preserved this record of Saintillus's narcotics sales by taking screenshots of each of Saintillus's drug listings as they appeared on the dark web in real time.  *See* Ex. 5 (containing screenshots of Saintillus's drug vendor pages as captured during investigation by Inspector Bauwens); *see also* U.S.S.G. § 2D1.1, cmt. n.5 (noting that sentencing courts may rely on "financial or other records" to approximate drug weight).  And, Inspector Bauwens will also discuss how he derived his estimate of Saintillus's historical sales by taking the number of sales Saintillus's own vendor page stated he had made for each listing of controlled substances and multiplying that by the weight of each drug in the listing.  *See* Ex. 4; *Gordon*, 2021 WL 3781722, at *1–2 (approving of use of "supplier's online price listings" to approximate drug weight).

Additionally, Inspector Bauwens will testify about why his estimate of Saintillus's historical sales on the dark web almost certainly underestimates the amount of drugs Saintillus actually distributed.  As Inspector Bauwens will explain, Saintillus set up his Empire marketplace drug listings in

---

[2] Another government witness—likely Homeland Security Investigations Special Agent Aron Mann, who developed an expertise in the dark web by conducting dozens of investigations of narcotics dealers who operate there—will testify about how dark web narcotics work and explain why the historical sales numbers displayed on Saintillus's vendor page are accurate.

a unique way that allowed purchasers to increase the amount of narcotics they bought from him during the checkout process by paying for additional shipping costs that were not reflected in the historical number of sales made of each listing.  *See, e.g.*, Ex. 5 at SAINTILLUS_00000292 (containing screenshots from undercover purchase charged as Count 9 of superseding indictment in which Saintillus's listing instructs customers to "go to shipping if u want larger amounts").  In other words, Saintillus's customers could buy more actual drugs than each listing advertised by paying for more "shipping."  *See* Ex. 6 at 9B-002 (indicating that undercover agent purchased fourteen grams of fentanyl from Saintillus by placing single order on seven-gram listing and doubling order amount by paying $2,600 in shipping costs).  Since these extra drugs disguised as extra shipping costs were not displayed on the portions of Saintillus's vendor page to which Inspector Bauwens had access while developing his sales estimate, Inspector Bauwens's estimate likely undercounted the amount of drugs that Saintillus actually sent through the mail.[3]

Finally, testimony from the government's witnesses at an evidentiary hearing will make clear that the data preserved on screenshots of Saintillus's dark web vendor page is the functional equivalent of a physical ledger that might be found in a drug dealer's physical residence.  Courts properly rely on such ledgers as evidence establishing drug weight for purposes of sentencing, and there is no reason for the Court to treat an electronic ledger automatically updated on the internet any differently from a physical ledger written down on paper.  *See, e.g.*, *United States v. Abdulahi*, 523 F.3d 757, 761 (7th Cir. 2008) (upholding district court's drug weight finding based in part on agent's extrapolation from drug ledgers to drug weight); *United States v. Rivera*, 746 F. App'x 65, 68 (2d Cir. 2018); *United States v. Flanagan*, 484 F. App'x 973, 975 (5th Cir. 2012) (upholding inclusion of cocaine sales found on ledger in calculating narcotics weight under U.S.S.G. § 2D1.1); *United States v. Galaz-Felix*, 221 F. App'x 790, 795–97 (10th Cir. 2007) (same).

///

---

[3] Inspector Bauwens will also provide testimony at the evidentiary hearing establishing another reason why the PSR's drug weight calculation underestimates Saintillus's sales:  Evidence from Saintillus's cellular phones demonstrates that he consummated a number of drug sales directly with customers using text messages and an encrypted messaging application called Wickr.  *See, e.g.*, Ex. 10 (containing Wickr chat between Saintillus and user "boiboi22" consummating sale for opioid referred to as "roxies," as well as promise from "boiboi22" to purchase more in future).

Hence, based on Inspector Bauwens's and Special Agent Mann's anticipated testimony, the Court should overrule Saintillus's objection to the PSR's calculation of the amount of drugs for which he is responsible.

### 4.   Saintillus's Own Conduct Corroborates the PSR's Calculation.

The Court should also overrule Saintillus's objection to the PSR's drug weight calculation because the government's anticipated witness testimony is corroborated by other evidence demonstrating that Saintillus regularly filled orders submitted via his vendor profile.

For example, for each of the twelve counts in the superseding indictment, Saintillus sent undercover agents exactly what they purchased on his dark web vendor profile. *See* Ex. 7 (containing exhibit prepared for trial displaying results of twelve undercover purchases charged in superseding indictment). Saintillus admitted that undercover agents received the drugs that he listed for sale on his dark web vendor page and that agents bought directly from those listings. *See* Mins., ECF No. 214 (containing Court's minutes reflecting that Saintillus pleaded guilty to all twelve counts in superseding indictment). This evidence demonstrates that when Saintillus's vendor page showed that he made a sale, his customers received in the mail what his vendor page indicated he sold. Hence, even if Saintillus were to assert that his vendor page intentionally overstated his historical sales to make him look like a more prolific vendor than he actually was, his own success rate in filling twelve undercover orders indicates that the sales numbers on his profile reflected the actual amount of drugs that Saintillus sold and sent to customers through the mail.

Additionally, Saintillus's words corroborate the PSR's drug calculation because they show that he effectively used the dark web to traffic drugs. For example, a video that Saintillus narrated while filming his Empire vendor page indicates that he was a skilled dark web drug distributor because he knew exactly how that marketplace worked and was familiar with its tools, such as its mechanism to resolve disputes. Ex. 1.[4] Text messages Saintillus sent to his friends underscore that he was a savvy dark web operator making thousands of dollars by selling drugs on it that he then shipped through the mail. *See, e.g.*, Ex. 8 (containing subset of text messages from Saintillus indicating his presence on dark

---

[4] Concurrently with this response to Saintillus's objections, the government is filing a notice that it lodged Exhibits 1 and 2 with the Court. Notice of Lodging, ECF No. 229.

web markets, that he was making thousands of dollars and needed transportation to post office, and that he needed more product to sell because his new vendor profile was "jumping a bit").  Hence why agents seized more than $25,000 from Saintillus's cryptocurrency wallets upon his arrest.  Ex. 9 (containing agent reports documenting cryptocurrency seizures from Saintillus); PSR ¶ 11.

5.   Reviews From Saintillus's Customers Corroborate the PSR's Calculation.

Another piece of evidence supporting the reliability of the PSR's drug weight calculation consists of the positive reviews that Saintillus's customers left on his vendor page.[5]

In July 2020, the overwhelming percentage of customer reviews for Saintillus's drug sales were positive.  Ex. 5 at SAINTILLUS_00000353 (displaying that more than 98% of Saintillus's sales received positive feedback).  Saintillus himself told interested buyers to review his positive feedback ratings, ostensibly because he knew that these ratings proved that he regularly and quickly filled customer orders with the controlled substances that were purchased.  *See, e.g.*, Ex 5 at SAINTILLUS_00000355 (instructing customers interested in purchasing Alprazolam to "CHECK FEEDBACK!!").  Just as other district courts have concluded in similar contexts, Saintillus's positive reviews for his drug sales corroborates the way that his marketplace's own data tallied and displayed his proficiency selling and mailing narcotics across the country.  *See* Mins., *United States v. McKernan*, No. 1:22-cr-00234 (E.D. Va. Apr. 7, 2023), ECF No. 39.

**C.   Saintillus's Offense Level Is Properly Enhanced for Possessing a Firearm.**

The PSR applies a two-level enhancement to Saintillus's offense level because agents executing a search warrant at his residence seized a firearm and thousands of ammunition rounds from Saintillus's bedroom.  PSR ¶¶ 11, 22.  Saintillus objects to this enhancement because he "is not being charged in the Eastern District of California with drugs or firearms located at the address where he was arrested."  Def.'s Objs. 5.  The Court should overrule this objection because the firearm found in Saintillus's bedroom qualifies as relevant conduct connected to his offense of distributing narcotics.

///

---

[5] As Special Agent Mann will explain, dark web marketplaces like Empire allow customers to provide feedback ratings to sellers, and these feedback ratings are available for all visitors to a given vendor page to observe.  This functionality helps create a measure of accountability and reliability on otherwise unregulated marketplaces for contraband like the drugs Saintillus sold.

"Under the guidelines, specific offense characteristics are determined on the basis of all relevant conduct, broadly defined, that occurred in relation to the offense of conviction." *United States v. Gomez*, 6 F.4th 992, 1008 (9th Cir. 2021), *cert. denied,* 143 S. Ct. 493 (2022).  For narcotics offenses, this means that "[u]nder § 2D1.1(b)(1), '[i]f a dangerous weapon (including a firearm) was possessed,' a two-level enhancement is applicable." *Id.* (second alteration in original).  "Application Note 11 to § 2D1.1(b)(1) provides that '[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.'" *Id.* (alteration in original) (quoting U.S.S.G. § 2D1.1 cmt. n.11(A)).  And, "[i]n determining whether the weapon 'was connected with the offense,' [the Ninth Circuit has] concluded that the 'offense' in this context refers to 'the entire course of criminal conduct,' not just the crime of conviction." *Id.* at 1009 (quoting *United States v. Willard*, 919 F.2d 606, 610 (9th Cir. 1990)).  Hence, district courts properly apply this two-level enhancement even "when defendants were arrested miles away from the firearms stored at their homes or places of business." *Id.* at 1008.

          1.     <u>Saintillus Possessed a Firearm at the Same Time and From the Same Location From Which He Distributed Drugs Across the Country.</u>

Saintillus fails to demonstrate that it is clearly improbable that the firearm agents seized inside his room was connected to his drug dealing.

The firearm was in the same room where Saintillus kept narcotics, cutting agents, proceeds from his drug sales, and the digital devices that he used to make those sales.  Ex. 11 (containing summary of evidence seized inside Saintillus's room).  Evidence seized from Saintillus's cellular phone indicates that this firearm belonged to him and that he possessed it during the same time he was shipping narcotics across the country that he sold on the dark web.  *See* Ex. 2 (containing "selfie" video of Saintillus with firearm); *see also Gomez*, 6 F.4th at 1009 (noting that "this enhancement 'reflects the increased danger of violence when drug traffickers possess weapons'" (quoting U.S.S.G. § 2D1.1(b)(1) cmt. n.11(A))).  Based on this evidence, the Court should conclude that Saintillus possessed the Sig Sauer firearm found in his residence in connection with the drug trafficking that he conducted out of that same location.

///

///

2.     Saintillus's Objection Misapprehends the Broad Nature of the Enhancement Under U.S.S.G. § 2D1.1(b)(1).

Saintillus's objection is also meritless because it erroneously assumes that the firearm enhancement in U.S.S.G. § 2D1.1 only applies to offenses for which a defendant is charged or convicted. Def.'s Objs. 5. The opposite is true, because "an enhancement under § 2D1.1(b)(1) can be appropriate 'based on all of the offense conduct, not just the crime of conviction.'" *Gomez*, 6 F.4th at 1009 (quoting *United States v. Boykin*, 785 F.3d 1352, 1364 (9th Cir. 2015)).

Here, Saintillus's "conduct, broadly defined, that occurred in relation to the offense of conviction" certainly included his possession of tools and indicia of narcotics distribution at his residence. *Id.* at 1008. Indeed, agents seized the firearm and drug indicia from Saintillus's room the day after he mailed fentanyl to the Eastern District of California, for which Saintillus stands convicted as charged in Count Twelve of the superseding indictment in this case. Superseding Indictment 4, ECF No. 159 (charging Saintillus with distributing fentanyl on October 26, 2020); Mins., ECF No. 214; Ex. 11.

Since the evidence of Saintillus's offense conduct includes all the tools of drug dealing that agents found in his residence, the Court should apply the two-level enhancement for his possession of a firearm in connection with that drug dealing.

**D.     The Court Is Required to Apply the Version of the Guidelines in Effect at Sentencing.**

Saintillus objects to his criminal history score calculation because of a proposed amendment to the Guidelines that could change the treatment of defendants who commit their offense while under a criminal justice sentence. Def.'s Objs. 5–6. This objection is meritless because the Court is required to apply the Guidelines in effect at the time of sentencing. *See* 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a).

Unless Congress provides otherwise, a proposed Guidelines amendment takes effect only after a prescribed period of congressional review has elapsed. *See* 28 U.S.C. § 994(p); *Stinson v. United States*, 508 U.S. 36, 41 (1993) ("Amendments to the Guidelines must be submitted to Congress for a 6-month period of review, during which Congress can modify or disapprove them."). In this instance, absent

Congressional action, the amendment upon which Saintillus relies will not take effect until November 1, 2023.  Accordingly, the Court should overrule Saintillus's objection to his criminal history calculation (about which he has no other objection) and confirm that his criminal history category at the time of sentencing is as calculated in the PSR.

However, if the Court is inclined to reduce Saintillus's criminal history score based on a proposed Guidelines amendment that has yet to take effect, the Court must calculate the applicable guideline range under the current version of the Guidelines first.  Then, the Court may vary downward, in light of the proposed amendment.  If the Court is inclined to vary downward, the government requests that the Court clearly state that any variance is as a result of the proposed amendment, so that Saintillus will not receive a further reduction if the amendment becomes retroactive.

### III.     CONCLUSION

None of Saintillus's objections to his PSR have merit.  He does not accept responsibility for his conduct, he sold a large amount of narcotics as demonstrated by independent and corroborated evidence, he possessed a firearm in the same location from which he ran his drug mailing operation, and his preferred criminal history calculation is based on a version of the Guidelines that will not be effective when he is sentenced.  Accordingly, the Court should overrule each of Saintillus's objections and adopt the PSR as written.

Dated:  August 21, 2023                          PHILLIP A. TALBERT
                                                 United States Attorney


                                          By:   /s/ SAM STEFANKI
                                                 SAM STEFANKI
                                                 ROSS PEARSON
                                                 Assistant United States Attorneys